**THIRD DIVISION**
**DOYLE, P. J.,**
**DILLARD, P. J., and BROWN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**October 27, 2021**

# In the Court of Appeals of Georgia

A21A1023. CHYBICKI et al. v. COFFEE REGIONAL MEDICAL
     CENTER, INC. et al.

BROWN, Judge.

Donald Brian Chybicki, in his capacities as the surviving spouse of Sandra Chybicki, as well as the executor of her estate, along with Ms. Chybicki's two adult children (collectively "plaintiffs"), appeal from two summary judgment orders entered by the trial court in this medical malpractice/wrongful death case brought against numerous persons and entities, including the appellees in this appeal, Coffee Regional Medical Center, Inc. ("the hospital") and Myra Belk, R. N. (collectively "hospital defendants"). Plaintiffs contend that the trial court erred in (1) concluding that a treating physician, Dr. William Paul Ives, was an independent contractor for whom the hospital could not be held liable and granting partial summary judgment to the

hospital on this ground; (2) finding that the hospital defendants were entitled to summary judgment in their favor based upon an alleged lack of admissible causation evidence; and (3) entering an order excluding the opinion of Meg Warren, R.N., pursuant to OCGA § 27-7-702, which governs the admissibility of expert testimony. For the reasons explained below, we affirm.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. In reviewing a grant or denial of summary judgment, we owe no deference to the trial court's ruling and we review de novo both the evidence and the trial court's legal conclusions. Moreover, we construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion. In doing so, we bear in mind that the party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact.

(Citations and punctuation omitted.) *Swint v. Alphonse*, 348 Ga. App. 199, 199-200 (820 SE2d 312) (2018). So viewed,[1] the evidence shows that on June 28, 2016, Ms. Chybicki, who was 57 years old, was admitted to the hospital after showing

---

[1] While all of the same evidence submitted to the trial court appears in the record before us, it does not include the depositions of nurse Belk and an emergency room physician, even though their testimony is referenced in the depositions that were submitted for the trial court's review.

"signs/symptoms of sepsis." For many years, Ms. Chybicki had been diagnosed with hypertension, diabetes, and high cholesterol; she was also morbidly obese. A CT scan revealed kidney stones, and she underwent surgery, performed by Dr. Alfred Walter Mazur, to remove them.

Dr. Ives was the anesthesiologist for Ms. Chybicki's surgery. He started work at 7:00 a.m. on the day of the surgery, and her surgery was the last case of the day. Dr. Ives stated in his interrogatory responses that "a certified registered nurse anesthetist ["CRNA"] was not necessary during [the] surgery [because he] personally attended to Mrs. Chybicki for anesthesia care." He explained that the hospital typically had four operating rooms running with the anesthesiologists in and out of the operating room in which CRNAs delivered anesthesia. As the day winds down, his practice was to let other providers (CRNAs and the other anesthesiologist) go home. After the other anesthesiologist and CRNAs left for the day, the only other medical provider in the hospital who could have attempted an intubation of a patient in addition to Dr. Ives was an emergency room physician. Since Ms. Chybicki was the last case of the day, Dr. Ives provided her anesthesia by himself. He described her as being "moderately difficult" to intubate before the surgery, but was able to do it on his first

3

try. He explained that she was harder to intubate because of "redundant tissue . . . everywhere" secondary to her obesity.

Following her surgery and after determining that she met all of the respiratory criteria, Dr. Ives extubated Ms. Chybicki in the operating room around 4:32 p.m. Dr. Ives testified that he did not believe her respirations were shallow or labored in any way after he extubated her, but he nonetheless placed a nasal airway device on her while she was still in the operating room, perhaps because she was snoring or making upper airway noises. At 4:39 p.m., she was admitted to the post-anesthesia care unit ("PACU"), which was located approximately 30 feet away from the operating room. Dr. Ives "immediately" removed the nasal airway device and remained at her bedside. A vital sign report completed at 4:39 p.m. stated that Ms. Chybicki had a fever of 102.7 degrees Fahrenheit, an elevated heart rate (160) and blood pressure (152/122), and "labored" respirations. A note indicated that an oxygen saturation percentage ("O2 Sat") was unable to be obtained even though "multiple sites" were attempted. While Dr. Ives did not know why this reading could not be obtained, he thought that one explanation could be that early in Ms. Chybicki's postoperative course in the PACU, she began complaining of flank pain and became agitated, "[n]ot holding still, pulling off monitors, pulling off oxygen." Dr. Ives acknowledged that other than an

end-tidal CO2 measurement, which was not available in the PACU, the O2 Sat reading would be the next best way to determine if a person was receiving sufficient positive ventilation.

Five minutes later, at 4:44 p.m., the vital sign report states "unable to get [O2] sat reading" and Ms. Chybicki's respirations were still "labored," her pulse was 159, and her blood pressure was 172/123. By 4:49 p.m., her blood pressure was 263/128, her breathing was "labored," her pulse was 161, and her O2 Sat was 80 percent.

A note on the vital sign report states that at 4:49 p.m., Dr. Ives was bedside and assisting ventilations with an Ambu bag. Dr. Ives testified that approximately fifteen minutes after Ms. Chybicki arrived in the PACU, he decided he needed to reintubate her because she was getting septic, her O2 Sats were diminishing, and she needed a definitive airway. Dr. Ives was unable to successfully reintubate her after numerous attempts, documented as anywhere between four and eight times. Dr. Ives testified that he only actually attempted to intubate Ms. Chybicki four times, explaining that "looks" were mischaracterized as an actual attempt.[2]

---

[2] One of the plaintiffs' experts testified that "this idea that there's look-sees and then there's really attempts. That's ridiculous. You put a laryngoscope in someone's mouth, that's an attempted laryngoscopy" that should not be done without an intent to intubate.

5

In between intubation attempts which lasted approximately 20 to 30 seconds, Dr. Ives used the Ambu bag and Ms. Chybicki's O2 Sat levels ranged from 96 to 97 between 4:54 p.m. and 5:09 p.m. Dr. Ives called a code blue at 5:19 p.m. when Ms. Chybicki did not have a pulse, which he described as "fairly sudden" and "unexpected." CPR was immediately initiated with continued ventilation by Dr. Ives. Dr. Brulte, an emergency room physician who responded to the code, successfully reinutubated Ms. Chybicki on his second try at 5:30 p.m. Dr. Ives testified that he thought Dr. Brulte was able to successfully reintubate Ms. Chybicki "because he had two pairs of hands because [Dr. Ives] was helping him with head position and supporting her head," something that had not been available to him during his attempts before the code was called; he did not know if nurse Belk could have done this for him. Dr. Ives testified that Ms. Chybicki's O2 "[S]ats were consistently suboptimal but not — that's not what caused the code. She lost her pulse."

After intubation, Ms. Chybicki stabilized and was transferred to the ICU. The plaintiffs' complaint alleges that she was subsequently diagnosed as being in a "'vegetative state'" and remained in the hospital until her death on July 23, 2016, from cardiopulmonary arrest.

6

Dr. Thomas Mitros, a standard of care expert retained by the plaintiffs, testified that Dr. Ives never should have done the anesthesia for the surgery by himself and should have had another anesthesiologist or CRNA attending the surgery with him. When Dr. Ives was unable to reintubate Ms. Chybicki on his second attempt, he should have called for additional help from a surgeon or the emergency room. He also opined that Dr. Ives "should have taken this patient back into the [operating room where he has better equipment] . . . when he didn't get his second intubation. . . . It gives you so much more information in a difficult situation like this." But this would have been difficult to do with only one nurse in the PACU and Dr. Ives using the Ambu bag on the patient; if there had been four people, she could have gone back to the operating room "lickety split."

With regard to Dr. Ives' inability to intubate Ms. Chybicki, the expert explained that "he did not perform to the level of an average, competent anesthesiologist" due to one or a combination of his lack of experience, the development of tunnel vision due to panic, or fatigue. "All I know is [an emergency room doctor] who is not supposed to be as skilled as he is, you know, as we view it in the medical community, came up and easily intubated this patient, did it in a couple minutes."

7

He also criticized that the PACU was staffed with only Dr. Ives and nurse Belk. If there had been another anesthesia provider there and another nurse, Dr. Ives would not have had to call for help. In his view, it was a violation of the American Society of Post Anesthesia Nurses for nurse Belk to be in the PACU alone. Another nurse would have enabled them to get an oxygen monitor reading faster. While he believed the lack of another nurse "wasn't good" for Ms. Chybicki, he could not say "how much the delay contributed to the ultimate outcome." He also asserted that nurse Belk improperly scored Ms. Chybicki on an Aldrete score used to appraise a patient in the post-operative, post-anesthesia environment, but acknowledged that it probably did not contribute to her injuries.

He also had no criticism of the timing of Dr. Ives' decision to extubate Ms. Chybicki after surgery or the timing of his decision to attempt to reintubate her. He agreed that a failure to intubate on the first try is not negligence and that bagging the patient between intubation attempts is appropriate, which was done for Ms. Chybicki. He could not say, however, whether she adequately ventilated with the Ambu bag because he did not have end-tidal carbon dioxide ("$CO_2$") readings. $CO_2$ readings are important because when a person is not breathing well they will have

a rising CO2 and a falling blood pH. Those two happen concomitantly, and that culminates in circulatory collapse because as the blood pH starts to fall, the heart and the circulation starts to get irritable and it culminates in a cardiac rhythm disturbance, often ventricular tachycardia, ventricular fibrillation, and then circulatory. . . . When you're in a ventricular fibrillation, you are in circulatory collapse; there's no effective blood flow.

Dr. John Kress, a causation expert retained by the plaintiffs, testified that Ms. Chybicki "had postoperative respiratory failure that culminated in circulatory collapse. She was resuscitated, but in the throes of the circulatory collapse and the CPR and advanced life support that she received, she suffered anoxic brain injury." The anoxic brain injury occurred when her heart stopped beating. He explained that

you can only get anoxic brain injury one way, and that is if the brain gets no blood flow. . . . So as long as there is blood flowing, your brain will not suffer anoxic injury. . . . So she suffered a cardiac arrest, and while she was getting CPR, there was a period where she wasn't getting CPR. She's anoxic for that bit of time.

He opined that her post-operative respiratory failure was caused by her morbid obesity, a mass in her glottic opening, her position of lying on her back, and the administration of fentanyl, an opiate that suppresses the brain stem's drive to breathe.

9

In Dr. Kress' view, by the time Dr. Ives first started using a manual Ambu bag to lower Ms. Chybicki's CO2 levels, it was too late to prevent her circulatory collapse. But, if she had received "more effective Ambu bagging than what was given, earlier placement of an endotracheal tube, she could have been rescued from that tipping point. . . . So if you got the tube in faster, I think the tipping point may not have been reached." He admitted that there was no data to show that Ms. Chybicki was not being ventilated sufficiently with the Ambu bag, and that she was ventilated to some degree between the intubation attempts.

In his experience, the "degree of anoxic brain injury that Ms. Chybicki had is devastating and the prognosis for meaningful recovery is dismal." He explained that the anoxic injury occurred in connection with the cardiac arrest, in which all blood stops flowing to the brain. He believed her outcome "would have been vastly different" if her heart had not stopped. He disagreed with a theory "in the progress notes" that sepsis may have caused her heart to stop. Dr. Kress expressed no opinions as to the "extent [nurse] Belk's actions contributed to the injuries" sustained by Ms. Chybicki.

Dr. Kress testified that because no autopsy was performed, "we can't say exactly what the cause of [her later] death is. There's a list of possibilities. . . . [S]he

10

could have had a pulmonary embolism, . . . a mucous plug, . . . a myocardial infarction, . . . [or] a cardiac rhythm problem. . . ." In his view, these four possible causes of death "could conceivably be connected to the primary event;" and it was "more probably true than not" that her death was caused by "her initial primary respiratory and circulatory collapse."

Meg Warren, a board-certified, registered nurse and certified perianesthesia nurse retained by the plaintiffs, testified that nurse Belk violated the standard of care by failing "to escalate up the chain of comm[a]nd when Ms. Chybicki was having issues with not being able to obtain a pulse ox and difficulty of Dr. Ives in . . . re-intubating." With regard to escalating, Warren opined that nurse Belk "could have called a rapid response to get more help to assistant [sic] herself and Dr. Ives at the time. So, she could have gone up the chain of command, whether it's to her supervisor, who is on call or in the hospital that day, who could help intervene to get the help she needed." At her hospital, a rapid response team would consist of a "respiratory therapist, the hospitalist . . . , and nursing supervisors, and maybe an ICU or CCU nurse." It is a lower level response than a code blue. While some facilities allow a respiratory therapist to intubate a patient, Warren did not know whether the hospital in this case allowed respiratory therapists to intubate. Likewise, she did not

11

know whether an emergency room doctor, who would be qualified to intubate, was on the hospital's rapid response team.[3]

As to the point in time that a rapid response team escalation should have happened, she stated that two failed attempts at intubation might not warrant escalation, but that three failed attempts would if a nurse observed the doctor having difficulty. While her affidavit stated that the number of attempts alone would have warranted escalation, she also testified that the amount of time that passed, regardless of the number of attempts, also required escalation. In her view, the escalation to a rapid response team should have happened "[w]hen they weren't able to get the . . . oxygen level within the first ten minutes[4] . . . [p]robably after the second vital sign [five minutes in] when she was struggling." She would have done so even if an anesthesiologist was present and said there was no need and that everything was under control.

---

[3] Our de novo review of the record revealed no evidence regarding the existence of or type of providers on any "rapid response team" for the hospital in this case.

[4] Warren was not critical of nurse Belk's inability to get an O2 Sat reading as this can be difficult for a variety of reasons.

Early in her deposition, Warren confirmed that the affidavit attached to the plaintiffs' complaint included all of her opinions in this case, and that it was based upon only her review of the medical records. She did not review Dr. Ives' deposition transcript before she was deposed, even though she acknowledged that nursing care is impacted by a physician being in the room. She agreed at the conclusion of her deposition that she had no "other opinions" in this case that she had not described in her deposition.[5] Warren offered the following opinion in her affidavit that was attached to the plaintiffs' complaint:

> The acts and omissions of Nurse Belk set out above fell below the standards of care and diligence that even inattentive and careless persons are accustomed to exercise and caused Ms. Chybicki to suffer serious, debilitating, and life threatening injuries, including the extensive anoxic brain injury, brain damage, and encephalopathy that occurred due to her inability to receive the oxygen required for her brain and central nervous system to maintain normal function post-surgery and post-anesthesia.

In her affidavit, she stated that nurse Belk violated the standard of care by:

> Failing to advocate for her patient by escalating and reporting the situation and circumstances presented by (1) Ms. Chybicki's

[5] In addition to nurse Belk's failure to escalate to a rapid response team, Warren also took issue with the level of detail in her charting in the medical record.

13

deteriorating condition and (2) Dr. Ives' extensive difficulties, over nearly an hour's time, to ensure that Ms. Chybicki was receiving sufficient oxygen, and adequate airway management, up the chain of command.

The hospital subsequently moved for partial summary judgment on the issue of whether it could be held vicariously liable for the alleged negligence of Dr. Ives, and the trial court granted the motion. The hospital defendants moved for (1) summary judgment on the issue of whether their alleged action caused any injuries to Ms. Chybicki and (2) to exclude the opinions of Warren concerning her "escalation of care opinions as she is not qualified to render the opinions given." The trial court granted both of these motions as well.

1. Plaintiffs contend that the trial court erred by granting summary judgment in favor of the hospital on their claim against the hospital for the negligence of Dr. Ives based upon a theory of respondeat superior. They assert that a written contract fails to unambiguously show that Dr. Ives was an independent contractor under OCGA § 51-2-5.1 (f) and that application of a multi-factor analysis shows that genuine issues of material fact exist as to whether Dr. Ives was an independent contractor.

Our analysis begins with OCGA § 51-2-5.1 (b), providing that

14

no hospital which complies with the notice provisions of either subsection (c) or (d) of this Code section shall be liable in a tort action for the acts or omissions of a health care professional unless there exists an actual agency or employment relationship between the hospital and the health care professional.

Plaintiffs conceded below and on appeal that the hospital complied with these notice requirements, and the evidence in the record supports this concession. OCGA § 51-2-5.1 (f) provides in relevant part:

> Whether a health care professional is an actual agent, an employee, or an independent contractor shall be determined by the language of the contract between the health care professional and the hospital. In the absence of such a contract, or if the contract is unclear or ambiguous, a health care professional shall only be considered the hospital's employee or actual agent if it can be shown by a preponderance of the evidence that the hospital reserves the right to control the time, manner, or method in which the health care professional performs the services for which licensed, as distinguished from the right to merely require certain definite results.

In this case, a contract between the following parties was signed by each of them: the hospital, Dr. Ives, designated as "'Physician'" in the contract, and Southeastern Pain Consultants, P. C., a Georgia professional corporation designated as "'Corporation'" in the contract; the contract stated that Dr. Ives "is the sole shareholder, officer and

15

director of the Corporation." As a contract clearly exists "between the health care professional and the hospital," we must determine from "the language of the contract" whether Dr. Ives was "an actual agent, an employee, or an independent contractor" of the hospital. Id.

The preamble of the contract states: "WHEREAS, Corporation is willing to accept this Agreement and take on the responsibility of providing, through the services of Physician, medical services involved in the provision of anesthesia in connection with the care of patients in the Hospital. . . ." Under a numbered heading titled "Services by Corporation," the contract states: "In accordance with and subject to the terms and conditions hereinafter provided, Corporation shall, as an independent-contractor, provide services through qualified physicians, including Physician, providing coverage of the Hospital's Anesthesiology Department as hereinafter provided. . . ." In a heading titled "Physician Obligation," the contract states that "[t]he Corporation shall, through the Physician and other physicians employed or contracted by it, practice medicine as anesthesiologists in the anesthesiology Department at the Hospital," and a sentence contained within the same provision states: "The Hospital shall not have and shall not exercise such control over the manner in which *these duties* are performed as would jeopardize Corporation's

16

status as an independent contractor, as further outlined . . . below." (Emphasis supplied.)

There are various references throughout the contract to physicians "employed by" the Corporation, and the contract contained the following provision governing "Manner of Performance":

> In the performance of professional Anesthesiology services hereunder the Corporation shall at all times act as an independent contractor practicing its profession, not as an employee or agent of the Hospital. Neither the Corporation nor physicians performing services for the Corporation pursuant to this Agreement whether said physicians be members, partners, employees, subcontractors, or otherwise, shall have any claim under this agreement or otherwise against the Hospital for vacation pay, sick leave, retirement benefits, Social Security, workers' compensation, disability benefits, unemployment insurance benefits, or employee benefits of any kind. The Corporation shall be fully responsible for performing and seeing that any associates or others under its direction and control perform such services in compliance with the standards set forth herein, the interest of the Hospital being to assure that Anesthesiology Services are performed in a competent, efficient, effective, satisfactory manner. The Hospital and the Corporation shall continually strive to improve the quality and maintain a reasonable cost of medical care furnished patients of the Hospital.

With regard to "Non-physician Personnel" in the Anesthesiology Department, the contract states that they "shall be employed or assigned by the Hospital, after consultation with the Corporation[, ]" with the Hospital responsible for paying their wages and providing benefits.

Plaintiffs assert that the language of this contract failed to unambiguously show that Dr. Ives was an independent contract as it only expressly designates the Corporation as an independent contractor. The hospital contends that "[t]he intent of the contract [was] to hold both Ives and his Corporation as independent contractors rather than employees of the Hospital."

In *Whitaker v. Zirkle*, 188 Ga. App. 706 (374 SE2d 106) (1988), disapproved on other grounds, *Cleaveland v. Gannon*, 284 Ga. 376, 380 (1) (667 SE2d 366) (2008), a case decided before the enactment of OCGA § 51-2-5.1, we concluded that a doctor and his professional corporation were clearly independent contractors of a hospital based, in part, upon a contract between the hospital and a professional corporation, of which the doctor was the sole member, describing the professional corporation as an independent contractor. Id. at 708 (2). Similar to the contract at issue here, though stated a little differently, the contract also provided that the hospital would not direct or control the work of the professional employees of the

18

professional corporation. Id. Based upon our decision in *Whitaker*, as well as our review of the contract language as a whole in the case now before us, we conclude that Dr. Ives was an independent contractor of the hospital rather than an employee.[6] Accordingly, the hospital cannot be held liable for his conduct under a theory of respondeat superior, *Parker v. Hosp. Auth.*, 214 Ga. App. 113, 114 (2) (446 SE2d 766) (1994), overruled on other grounds, *Sheriff v. State*, 277 Ga. 182, 188 (2) (587 SE2d 27) (2003), and the trial court did not err by granting partial summary judgment in favor of the hospital on this theory of liability.[7]

---

[6] Based upon our review of the plaintiffs' brief, they do not appear to be asserting that the contract showed that Dr. Ives was both an independent contractor and an actual agent of the hospital. To they extent they do, such a claim has no merit. See *Foster v. Southern Regional Health System*, 318 Ga. App. 541, 544 (3) (734 SE2d 268) (finding doctor was not actual agent of hospital based in part upon contract between hospital and the doctor's employer designating the employer as an independent contractor of the hospital).

[7] Our opinion in *Thomas v. Tenet Healthsystem GB*, 340 Ga. App. 78 (796 SE2d 307) (2017), does not require a different result because in that case, the doctors were not parties to the contract between the professional corporation and the hospital. Instead, "[the doctors] had contracts with their physician groups who in turn had contracts with [the hospital]." Id. at 81 (1). We therefore concluded that "these contractual relationships do not fall under OCGA § 51-2-5.1 (f)." Id. In this case, the contract expressly provided that it was "by and between" the hospital and Dr. Ives. The fact that Dr. Ives' professional corporation was also a party to the contract does not take it outside the scope of OCGA § 51-2-5.1 (f).

19

2. Plaintiffs assert that the trial court erred by granting the hospital's motion for summary judgment based upon a lack of evidence showing that any alleged deviations from the standard of care by the hospital or nurse Belk caused any injuries to the decedent. They assert that the causation opinion offered by Warren in her OCGA § 9-11-9.1 affidavit, and affirmed by her in her deposition, creates a genuine issue of material fact on the issue. We disagree.

> To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained. In other words, a plaintiff must prove that the defendants' negligence was both the cause in fact and the proximate cause of his injury.

(Citation and punctuation omitted.) *Knight v. Roberts*, 316 Ga. App. 599, 603 (1) (730 SE2d 78) (2012). In *Freeman v. LTC Healthcare of Statesboro*, 329 Ga. App. 763 (766 SE2d 123) (2014) (physical precedent only), we stated that "it is axiomatic that no expert can testify outside the limits of his area of expertise, and Georgia law considers opinions about medical diagnoses to fall outside the limits of the expertise of a non-physician." (Citations and punctuation omitted.) Id. at 766. While we "decline[d] to adopt a 'bright line' rule that nurses may never testify to causation in

20

medical malpractice cases," we nonetheless concluded that the evidence "show[ed] that the nurse's causation opinion in this case fell outside her realm of expertise." Id. at 764. We reach a similar conclusion here.

Relying upon *Frausto v. Yakima HMA*, 393 P3d 776, 780 (Wash. 2017), the plaintiffs urge us to adopt a purported majority view allowing nurses to testify regarding causation in medical malpractice cases generally. But this decision was later explained at length by a federal district court in a well-reasoned opinion as follows:

> The court finds plaintiffs' authorities unpersuasive. *Frausto* does indeed point to a very slight majority among state court decisions—when the question is whether nurses are absolutely and categorically barred from ever addressing the issue of causation. But the case does not support the conclusion that registered nurses or licensed nurse practiciners may testify as to medical causation in general, let alone, as here, give an opinion as to the cause of death in cases with a complicated etiology. . . . When presented with proposed expert testimony by nurses as to the causation of medical conditions—other than bedsores—most courts have excluded it. And, more particularly, when the issue is the cause of a person's death, the exclusion appears virtually universal.

(Citations and footnotes omitted.) *Funk v. Pinnacle Health Facilities XXXII*, 353 FSupp.3d 1138, 1139-1142 (D. Kan. 2018). The other decision upon which the

21

plaintiffs primarily rely involved a nurse's ability to opine about the cause of bedsores and was distinguished by the *Funk* court on that ground. Id. at 1141, n.5, distinguishing *Freed v. Geisinger Med. Ctr.*, 971 A2d 1202 (Pa. 2009).

In this case we conclude, based upon the particular facts and circumstances, that the plaintiffs have failed to show that Warren was qualified to determine that the cause of Ms. Chybicki's anoxic brain injury, brain damage, and encephalopathy was nurse Belk's failure to escalate and request a rapid response team, particularly when plaintiffs have presented no evidence showing that a rapid response team at Coffee Regional Medical Center would have included a medical provider trained and authorized to intubate.[8]

---

[8] Our recent opinion in *Evans v. Med. Center of Central Ga.*, 359 Ga. App. 797 (860 SE2d 100) (2021), does not require a different result. In that case, we concluded that a nurse's opinion in combination with a medical doctor's opinion created a genuine issue of fact with regard to whether a hospital could be liable for a patient's death from an acute myocardial infarction after an alleged premature discharge the previous day. Id. at 104. Specifically, a doctor testified that the premature discharge led to the patient's death, and the nurse testified that various nursing failures with regard to the patient's symptoms contributed to that premature discharge. Id. In *Evans*, unlike this case, causation was "established by linking the testimony of several different experts." (Citation and punctuation omitted.) Id. at 102. Here, no medical doctor testified that escalation to a rapid response team at Coffee Regional Medical Center could have resulted in a different outcome for Ms. Chybicki.

22

3. The plaintiffs' remaining enumeration of error relating to the trial court's exclusion of Warren's testimony regarding the standard of care for escalation is rendered moot by our holding in Division 2.

*Judgment affirmed. Doyle, P. J., concurs. Dillard, P. J., concurs fully in Divisions 1 and 3, and in judgment only as to Division 2.*